UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:19-CR-00003-GNS-HBB

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.

AJANI JOHN STEVENS                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Objection (DN 31) to the Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation (DN 29) on Defendant's Motion to Suppress (DN 17). For the following reasons, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation ("R&R"), **DENIES** Defendant's motion, and **OVERRULES** Defendant's Objection.

### I.     BACKGROUND

#### A.    Summary of Facts

This case arises out of the stop and subsequent search of a vehicle driven by Defendant Ajani John Stevens ("Stevens"). On July 26, 2018, Trooper Jeremy Duvall ("Duvall") observed Stevens's vehicle traveling at a slow speed, and Duvall noticed that the vehicle had a dark window tint that he believed to be a violation of Kentucky state law. (R&R 2, DN 29). Moreover, the license plate was partially obscured such that the issuing state was covered, also a violation of state

1

law. (R&R 2). Duvall briefly followed Stevens's vehicle and then initiated a traffic stop. (R&R 2).

Once stopped, Stevens was unable to provide Duvall with a driver's license and the vehicle was not registered in Stevens's name because he said it belonged to his mother.[1] (R&R 2). Duvall asked Stevens his name, date of birth, and social security number and then communicated with dispatch to attempt to confirm Stevens's identity. (R&R 2). Stevens initially told Duvall his first name was "John" instead of "Ajani," which slightly delayed the identification of Stevens. (R&R 3; Pl.'s Suppression Hr'g Ex. 3, at 3:00). Roughly ten minutes into the traffic stop, dispatch provided Duvall with information about Stevens's name and address and advised that his license had been revoked. (Pl.'s Suppression Hr'g Ex. 3, at 10:04). Duvall then requested dispatch to look into Stevens's history and to determine which state placed a suspension on Stevens's license and the reason for the suspension. (Pl.'s Suppression Hr'g Ex. 3, at 10:20, 19:11).

Shortly after, Trooper Lawless ("Lawless") arrived on the scene at Duvall's request. (R&R 3; Pl.'s Suppression Hr'g Ex. 3, at 14:21). Duvall then asked Stevens to step out of the vehicle, and Duvall conducted a *Terry* frisk of Stevens that turned up no contraband. (R&R 3; Pl.'s Suppression Hr'g Ex. 3, at 15:23). After the frisk, Duvall asked Stevens why his license was suspended and spent several minutes discussing his criminal history. (Pl.'s Suppression Hr'g Ex. 3, at 15:35-18:55). Stevens then consented to a search of his vehicle. (R&R 3).[2] Lawless and

---

[1] In his objection, Stevens highlights that early on in the stop he told Duvall that his license may be in his wallet in the back, but that Duvall did not allow Stevens to step out of the car and retrieve it at that time. (Def.'s Obj. R&R 2, DN 31; Pl.'s Suppression Hr'g Ex. 3, at 2:54). Even so, nothing in the record suggests that Stevens's license was ever produced or discovered.

[2] Specifically, Duvall asked, "well while we are waiting on some of the records to come back, would it be okay if we searched your car?" (Pl.'s Suppression Hr'g Ex. 3, at 18:49-18:54). Stevens appears to have responded, "sure." Duvall asks again, "That's okay, man? Okay, good deal." (Pl.'s Suppression Hr'g Ex. 3, at 18:55).

2

Trooper Justin Rountree ("Rountree"), who had arrived on the scene, then conducted a search of Stevens's vehicle. (R&R 4). Lawless and Rountree conducted a thorough search and discovered a firearm in a tool pouch stored under the floor liner of the spare tire compartment. (R&R 4). Duvall then tested the degree of tinting on the windows and determined that the tint was in violation of state law. (R&R 4; Pl.'s Suppression Hr'g Ex. 2). Ultimately, Stevens was arrested and cited for having an obscured license plate, excessive window tinting, operating a vehicle without a valid license, and possession of a firearm by a convicted felon. (R&R 5).

B. **Procedural History**

On January 9, 2019, Stevens was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(l), 924(a)(2), and 924(e)(l). Stevens moved to suppress: (1) any evidence obtained as a result of an alleged illegal stop and subsequent search and seizure of his person and automobile and (2) all fruits of the alleged illegal search. (Def.'s Mot. Suppress, DN 17). The United States responded. (Pl.'s Resp. Def.'s Mot. Suppress, DN 18). The Magistrate Judge conducted an evidentiary hearing on the motion (Suppression Hr'g Tr., DN 25), and the parties submitted post-hearing briefs. (Pl.'s Resp. Def.'s Mot. Suppress, DN 27; Def.'s Mem. Supp. Mot. Suppress, DN 28).

The Magistrate Judge issued Findings of Fact, Conclusions of Law, and Recommendation, concluding that: (1) Duvall had probable cause to initiate the traffic stop; (2) the traffic stop was not unreasonably delayed; (3) Stevens consented to the search of the vehicle; and (4) the search did not exceed the scope of Stevens's consent. (R&R 7-12, DN 29). Stevens objected to the R&R, specifically arguing that his identity was confirmed prior to the search of his vehicle and that continued detention after that point impermissibly extended the length of the stop. (Def.'s Obj.

3

R&R 3, 5, DN 3). Furthermore, Stevens contends that the scope of the search exceeded his consent. (Def.'s Obj. R&R 5-6).

## II. DISCUSSION

The Magistrate Judge concluded, and Stevens concedes, that Duvall had probable cause to stop Stevens's vehicle. (R&R 8; Def.'s Obj. R&R 5). Moreover, Stevens does not object to the finding that he voluntarily consented to the search of his vehicle. (Def.'s Obj. R&R 5). Rather, Stevens contends, *first*, that he was detained longer than necessary to complete "the mission of the stop," and, *second*, the scope of the search exceeded his consent. (Def.'s Obj. R&R 5-6). The Court will address each of these objections in turn.

### A. The Mission and Length of the Traffic Stop

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. The touchstone of all Fourth Amendment analysis is reasonableness. *Katz v. United States*, 389 U.S. 347, 360 (1967). The Supreme Court has clarified that a lawful stop "justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The officer's mission includes "ordinary inquiries incident to [the traffic] stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (alteration in original) (internal quotation marks omitted) (quoting *Caballes*, 543 U.S. at 408).

Moreover, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. "Reasonable suspicion

requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Ellis*, 497 F.3d 606, 612-13 (6th Cir. 2007) (citation omitted). Courts must consider the totality of the circumstances, permitting officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id*. at 613. (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir.2002)).

In the present case, Duvall lawfully stopped Stevens because of the tinted windows and obscured license plate. It is not disputed that these facts established the probable cause necessary to justify the stop. (Def.'s Obj. R&R 5). Stevens objects, however, to his continued seizure after he was identified by dispatch and the "mission" of the stop was concluded. (Def.'s Obj. R&R 5). Specifically, Stevens argues that "[t]here is no reason the traffic stop should have continued beyond" the ten-minute mark when "Duvall found out [the] name, address, and fact Stevens'[s] license was suspended." (R&R 5).

Stevens's articulation of the facts, however, is misleading. While Stevens was initially stopped because of his windows and license plate, he was then unable to produce a driver's license and dispatch informed Duvall that Stevens's license had been revoked. As such, Duvall asked dispatch to look into Stevens's history to determine where and why his license had been revoked. Duvall then questioned Stevens for several minutes in an attempt to ascertain why Stevens did not have his license and why it was revoked in the first place. As described by Duvall, this determination was crucial to make because "[w]hen someone has a revoked operator's license, we can typically either make one of two determinations, and that would either be for a citable offense or for an arrest." (Suppression Hr'g Tr. 13:7-9). Duvall's further discussion with dispatch and his

5

questioning of Stevens all occurred *after* Stevens was identified by dispatch at the ten-minute mark of the stop. As such, Duvall's "mission" was still incomplete all of the way up to and including the search of Stevens's vehicle.[3]

Moreover, without photo identification, the purpose of the stop was incomplete because Duvall continued to harbor doubts about the identity of Stevens. As such, Duvall wanted to question Stevens about his criminal history and search Stevens's vehicle for some form of positive identification, preferably photo-identification. (Suppression Hr'g Tr. 10:13-18). Specifically, Duvall stated that he searched Stevens's vehicle for:

> Anything that could result in identification of himself. A lot of times we find people have hidden identification cards somewhere in the vehicle. So I'm looking for evidence of possibly further identifying himself. On the side of the interstate, we do deal quite frequently with identity theft, where somebody has memorized somebody's name, dates of birth, social security numbers, but yet a real identification will eventually be found.
>
> So my desire to search the vehicle was for things such as identifying a further piece of evidence that could positively identify himself as well as any other kind of contraband.

(Suppression Hr'g Tr. 23:18-24:3). When pressed on cross-examination, Duvall further clarified:

> I testified that the vehicle was not his. We had no picture identification of his. And I have worked several cases where somebody can memorize another person's identification

---

[3] Even if the "mission of the stop" was complete ten minutes into the stop, Duvall would still likely have had the reasonable suspicion necessary to justify the detention of Stevens for the additional eight minutes between his identification and his consent to search his vehicle. *See United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006) (collecting Sixth Circuit cases on what justifies reasonable suspicion). A close examination of the traffic stop video shows that Stevens was equivocal about whether he had a driver's license with him, misspoke when providing identifying information, and then called Duvall back to correct himself, thereby contradicting his earlier statements about his own name. (Pl.'s Suppression Hr'g Ex. 3, at 2:44-4:27). Moreover, the vehicle did not belong to him, and he was unable to provide a license or any other documentation to positively identify himself for Duvall. Finally, Duvall testified that Stevens demonstrated a "level of nervousness" throughout the stop. (Suppression Hr'g Tr. 19:5-8). Taken all together, these factors would support the level of suspicion needed to justify further detention even if the mission of the stop had been completed.

> . . . So based on my training and experience, I knew that there could be a possibility– further evidence of his identification could be discovered.

(Suppression Hr'g Tr. 24:10-18).

This is not a case where the officer completed a citation but then decided to extend the duration of the stop based on reasonable suspicion. Rather, Duvall did not and could not complete a citation for Stevens prior to the search because he was still attempting to determine and confirm important, relevant facts: why was Stevens's license revoked, which state was responsible for revoking Stevens's license, and whether Stevens really was who he claimed to be?[4] (Suppression Hr'g Tr. 11:13-14, 28:11-13). Under these circumstances, it is clear that the mission of the stop was incomplete up to the point that Stevens consented to the search of his vehicle. Thus, the length of the stop did not violate Stevens's rights in any way.

### B. The Scope of Stevens's Consent to Search

As noted, the touchstone of the Fourth Amendment is reasonableness. *Katz*, 389 U.S. at 360. It is undoubtedly reasonable for police to conduct a search of a suspect's property once the suspect has consented. *Florida. v. Jimeno*, 500 U.S. 248, 250 (1991). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id*. at 251 (citations omitted). In other words, "[w]hen law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the

---

[4] This Court agrees with the Magistrate Judge that it is "far-fetched . . . that, simply because Trooper Duvall was having trouble verifying Stevens'[s] identity, that the tool pouch would hold some evidence of identity theft when there were no other indicia of the crime." (R&R 11). The Court is persuaded by Duvall's testimony, however, that short of traditional identify theft, it is common practice for a suspect to memorize the name, date of birth, and social security number of another person to avoid revealing his true identity to police. (Suppression Hr'g Tr. 23:18-25, 24:10-13). As such, Duvall sought evidence that would positively identify Stevens.

7

consent given determines the permissible scope of the search." *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997) (*citing Jimeno*, 500 U.S. at 251-52). "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251 (citing *United States v. Ross*, 456 U.S. 798 (1982)).

In the present case, Stevens concedes that he voluntarily gave Duvall permission to search his vehicle. (Def.'s Obj. R&R 5). Stevens argues, however, that he did not explicitly consent to a search of the tool pouch found in the trunk of the vehicle in which the firearm was ultimately found. (Def.'s Obj. R&R 5). Rather, it appears that Stevens only provided general consent to search his vehicle. (Suppression Hr'g Tr. 11:21-12:4, 23:2-12). The question then is whether Stevens's general consent to search reasonably included a search of the tool pouch found in the trunk of the vehicle.

In *Jimeno*, the Supreme Court dealt with a nearly identical question: "whether it is reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car." *Jimeno*, 500 U.S. at 251. The Court concluded that it was objectively reasonable to conclude that consent to the search of a vehicle for narcotics included consent to search containers because a "reasonable person may be expected to know that narcotics are generally carried in some form of a container." *Id*.

In the suppression hearing, Duvall stated that he was searching Stevens's vehicle for "[a]nything that could result in identification of himself." (Suppression Hr'g Tr. 23:18). Furthermore, Duvall asked Stevens about other contraband that could "get [him] into any trouble." (Pl.'s Suppression Hr'g Ex. 3, at 17:15). Clearly then, it is reasonable to conclude that an identification card, other form of identification, or evidence of illegal activities more generally could be stored in a closed container such as Stevens's tool pouch. Unlike in *Jimeno*, however, it

does not appear that Duvall communicated the object of his search to Stevens. Therefore, this Court cannot compare the scope of the search to its "expressed object" because no objective was ever communicated to Stevens. Even so, "other courts have held that searches of closed containers should be allowed in cases like this one, where officers did not tell the suspect the object of their search." *Gant*, 112 F.3d at 243 (citing *United States v. Crain*, 33 F.3d 480 (5th Cir. 1994) (holding that consent to search vehicle included consent to search paper bag contained therein, despite fact that officers gave no indication as to what they were looking for)). Similarly, in *United States v. Canipe*, 569 F.3d 597 (6th Cir. 2009), the Sixth Circuit concluded:

> When Investigator Hagie asked Canipe whether he had anything in his vehicle that might be unlawful or about which he should know, his questioning placed Canipe on notice that any unlawful item would be the subject of his search. Thereafter, Canipe's general consent to search the vehicle reasonably included permission to search *any container that might have held illegal objects*.

*Id.* at 606 (emphasis added); *see also United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("That the defendant did not—and probably could not—know what the officer was looking for does not change our view of his consent. It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers. If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.").

Just as in *Canipe*, the present facts show that before Duvall requested consent to search the car, he asked Stevens a series of questions relating to whether or not there was contraband in the vehicle. Specifically, Duvall asked "Do you have any weapons in the vehicle today? . . . Anything that can get you into any trouble? . . . You said there was no guns in the car? . . . Any open alcohol?" (Pl.'s Suppression Hr'g Ex. 3, at 17:10-18:14). Stevens was therefore placed on notice that any illegal item would be the object of the search. As such, the tool pouch in which the gun was

9

ultimately discovered clearly falls within the category of "any container that might have held illegal objects." Duvall's questions placed Stevens on notice of the broad nature of the search, and Stevens's general consent was therefore sufficient to justify a search of closed containers within the vehicle, namely the tool pouch where the firearm was ultimately discovered.

In his objection, Stevens takes issue with Duvall's testimony and the Magistrate Judge's conclusion that Stevens specifically mentioned that the tool pouch was in the trunk when asked if there was anything illegal in the car. (Def.'s Obj. R&R 3). While Stevens is correct that he did not mention the tool pouch until well-after he consented to the search, this fact does not change the analysis. (Pl.'s Suppression Hr'g Ex. 3, at 23:10). Stevens gave Duvall general consent to search his car, which included the tool pouch in the trunk. It does not matter that this specific container was not explicitly mentioned when Stevens consented to the search. Moreover, as noted by the Magistrate Judge, Stevens did not limit or withdrawal his consent when the trunk was searched nor when the tool pouch was discovered and then searched.

In conclusion, Stevens voluntarily consented to the search of his vehicle. This general consent allowed Duvall and the other troopers to search the vehicle, including containers within, to look for contraband generally or evidence capable of positively identifying Stevens.

### III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. The Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation (DN 29) is **ADOPTED**, and Defendant's Motion to Suppress (DN 17) is **DENIED**.

2. Defendant's Objection (DN 31) is **OVERRULED**.

Greg N. Stivers, Chief Judge
United States District Court

November 4, 2019

cc: counsel of record